USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 93-2276 AMERICAN AUTOMOBILE MANUFACTURERS ASSOCIATION, ET AL., Plaintiffs, Appellants, v. COMMISSIONER, MASSACHUSETTS DEPARTMENT OF ENVIRONMENTAL PROTECTION, ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. A. David Mazzone, Senior U.S. District Judge] __________________________ ____________________ Before Selya, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ ____________________ Edward W. Warren, with whom Daniel F. Attridge, Stuart A.C. _________________ ___________________ ____________ Drake, Gary E. Marchant, Kirkland & Ellis, Robert F. Sylvia, Eric F. _____ ________________ ________________ _________________ _______ Eisenberg, Hinckley, Allen & Snyder, Phillip D. Brady, V. Mark _________ ___________________________ __________________ ________ Slywynsky, Of Counsel, American Automobile Manufacturers Association, _________ Charles H. Lockwood, and John T. Whatley, Of Counsel, Association of ___________________ _______________ International Automobile Manufacturers, Inc., were on brief for appellants. James R. Milkey, Assistant Attorney General, Deputy Chief, _________________ Environmental Protection Division, with whom Scott Harshbarger, __________________ Attorney General of the Commonwealth of Massachusetts, and David G. ________ Bookbinder, Assistant Attorney General, were on brief for appellee __________ Commissioner, Massachusetts Department of Environmental Protection. William H. Lewis, Jr., Hunter L. Prillaman, Morgan, Lewis & _______________________ _____________________ _________________ Bockius, Paul F. Ware, Jr., Michael J. Meagher, Scott L. Robertson, _______ _________________ __________________ __________________ Goodwin, Procter & Hoar, G. William Frick, and David T. Deal, Of _________________________ _________________ ______________ Counsel, American Petroleum Institute on brief for appellee American Petroleum Institute. Lois J. Schiffer, Acting Assistant Attorney General, David C. _________________ _________ Shilton, Timothy J. Dowling, Attorneys, Environment and Natural _______ ____________________ Resources Division, Jean C. Nelson, General Counsel, Alan W. Eckert, ______________ ______________ Associate General Counsel, and Michael J. Horowitz, Attorney, Office ____________________ of General Counsel, United States Environmental Protection Agency, on brief for the United States, amicus curiae. Jacqueline M. Warren, and Berle, Kass & Case on brief for ______________________ _____________________ American Lung Association, Natural Resources Defense Council, and Conservation Law Foundation, amici curiae. G. Oliver Koppel, Attorney General of the State of New York, _________________ Peter H. Schiff, Deputy Solicitor, Val Washington, Joan Leary _________________ _______________ ___________ Matthews, Helene G. Goldberger, Assistant Attorneys General; Michael ________ _____________________ _______ E. Carpenter, Attorney General of the State of Maine, Sarah Roberts _____________ _____________ Walton, Assistant Attorney General; Jeffrey L. Amestoy, Attorney ______ ___________________ General of the State of Vermont, J. Wallace Malley, Jr., Deputy ________________________ Attorney General; Jeffrey B. Pine, Attorney General of the State of _______________ Rhode Island, and Michael Rubin, Assistant Attorney General and ______________ Environmental Advocate, on brief for the States of New York, Maine, Vermont, and Rhode Island, amici curiae. ____________________ August 3, 1994 ____________________ BOWNES, Senior Circuit Judge. Plaintiffs- BOWNES, Senior Circuit Judge. ________________________ appellants, the Massachusetts State Automobile Dealers Association, Inc. and two trade groups of automobile manufacturers, appeal from an order denying their request for a preliminary injunction. Plaintiffs seek to stall the implementation of motor vehicle tailpipe emissions regulations adopted by defendant-appellee, the Commissioner of the Massachusetts Department of Environmental Protection (DEP). See Mass. Regs. Code tit. 310, 7.40-7.60. ___ Defendant-appellee, the American Petroleum Institute, intervened in support of the regulations. Prior to oral argument, plaintiffs moved to dismiss their appeal as to all issues but one: whether DEP's 1995 model year requirements should be enjoined. DEP opposes the motion for partial dismissal and requests costs and attorney's fees. We grant the motion for partial dismissal. We award DEP costs, but not attorney's fees. With respect to the 1995 model year requirements, the order of the district court is affirmed. I. I. BACKGROUND BACKGROUND __________ A. Cars and the Clean Air Act A. Cars and the Clean Air Act __________________________ The exhaust from a gasoline-powered engine is a source of air pollution. Motor Vehicle Mfrs. Ass'n v. New __________________________ ___ York Dep't of Envtl. Conservation, 17 F.3d 521, 524 (2d Cir. __________________________________ 1994) (hereinafter MVMA). Emissions from car tailpipes ____ -3- 3 include hydrocarbons and nitrogen oxides (NOx), constituents of ground-level ozone, a major component of smog. Id. at ___ 526. The Clean Air Act is the federal legislation governing tailpipe emissions. The Act directs the United States Environmental Protection Agency (EPA) to establish national ambient air quality standards (NAAQS) for pollutants such as ground-level ozone. Under the Act, states are responsible for developing and enforcing a plan, subject to EPA approval, for attaining and maintaining the NAAQS by regulating sources of air pollution. 42 U.S.C. 7410(a). States failing to meet the NAAQS risk sanctions, including the loss of federal highway funds. Id. 7509. EPA has ___ designated the entire state of Massachusetts as a "serious" nonattainment area for the ozone NAAQS. See 56 Fed. Reg. ___ 56,694, 56,776 (Nov. 6, 1991). Mobile sources of air pollution such as cars and trucks are subject to EPA regulation under 202 and 207 of the Act, 42 U.S.C. 7521, 7541. EPA emissions standards for hydrocarbons and nitrogen oxides apply to a given vehicle based on its weight, use classification, and model year. See ___ id. 7521, 7541; MVMA, 17 F.3d at 525-26. ___ ____ State regulation of motor vehicle emissions is generally preempted by the Clean Air Act, 42 U.S.C. 7543(a), with one exception: California can enforce its own -4- 4 standards, subject to EPA approval by way of a waiver under 209(b) of the Act, id. 7543(b) (the waiver requirement). ___ Consequently, there can be only two types of cars "created" under emissions regulations in this country: "California" cars and "federal" (that is, EPA-regulated) cars. See id. ___ ___ 7507. Other states cannot take any action that would force manufacturers to create a "third vehicle."1 Id. (the third ___ vehicle requirement). Section 177 of the Act allows other states to adopt standards "identical" to California's (the identicality requirement), but only if there is a two-year time lapse between the time the standards are adopted and the first model year affected by those standards (the leadtime requirement). Id. Similarly, 211 of the Act authorizes ___ EPA to regulate motor fuels and preempts any unapproved state ____________________ 1. The third vehicle provision states: Nothing in this section . . . shall be construed as authorizing any . . . State to prohibit or limit, directly or indirectly, the manufacture or sale of a new motor vehicle or motor vehicle engine that is certified in California as meeting California standards, or to take any action of any kind to create, or have the effect of creating, a motor vehicle or motor vehicle engine different than a motor vehicle or engine certified in California under California standards (a "third vehicle") or otherwise create such a "third vehicle." 42 U.S.C. 7507. -5- 5 regulations, except for California, which may enact fuel standards without EPA approval. Id. 7545(c)(4)(B). ___ -6- 6 B. DEP's Adoption of California LEV Regulations B. DEP's Adoption of California LEV Regulations ____________________________________________ In September 1991, California enacted a novel set of vehicle emissions and clean fuels requirements called the "Low Emissions Vehicles/Clean Fuels" (LEV/CF) program. The LEV component of the program requires the creation of four categories of California cars to meet increasingly stringent emissions standards, to be phased in over time: Transitional Low-Emission Vehicles; Low-Emission Vehicles; Ultra-Low- Emission Vehicles; and Zero-Emission Vehicles, such as electric cars. California has also established annually descending "fleet average requirements," based on sales targets for each category of vehicles. A fleet average requirement is a cap on the average emissions attributable to all classes of vehicles produced by a particular manufacturer in a given year (in other words, the manufacturer's "fleet"). California's requirements provide manufacturers with "flexibility to develop varying emissions within their entire fleet to meet [an] overall goal." MVMA, 17 F.3d at 535. On ____ January 7, 1993, EPA granted California a 209(b) waiver for the program. Meanwhile, on January 31, 1992, DEP adopted the LEV component of California's standards, intending to apply the standards beginning with 1995 models. DEP regulations allow new California cars to be leased, bought, sold, and registered in Massachusetts, but ban the acquisition, sale, -7- 7 and registration of new federal cars in the state. DEP's proposed regulations sent out for notice and comment contained fleet average requirements, but no such requirements appear in the final rule because DEP preferred to let the market determine the mix of new California cars in the state. C. Prior Proceedings C. Prior Proceedings _________________ Plaintiffs filed an action in the District Court for the District of Massachusetts, arguing that DEP's regulations are preempted by the Act because DEP allegedly failed to comply with 177 of the Act, 42 U.S.C. 7507. Plaintiffs moved for summary judgment and for a preliminary injunction, founding their motions on four claims: [1] the regulations are not "identical" to California's, in that DEP did not adopt California's clean fuels rules; [2] the regulations force manufacturers to create a "third vehicle" because of the higher sulfur content of gasoline in Massachusetts; [3] the regulations were adopted by DEP before EPA granted California a 209(b) waiver; and [4] the two- year leadtime requirement precluded DEP from applying the regulations to any 1995 models because two automakers planned to begin producing 1995 cars before two years passed after the regulations were adopted. With the parties' consent, the court stayed the summary judgment proceedings and ruled first on the motion -8- 8 for a preliminary injunction. The court denied the motion without a hearing, ruling that while plaintiffs demonstrated a risk of irreparable injury given the cost of vehicle emissions controls, the balance of equities and the risk of harm to the public interest did not clearly favor granting an injunction. The court also found that plaintiffs failed to demonstrate a likelihood of prevailing on the merits, which is the "sine qua non" of the preliminary injunction test. ____ ___ ___ Weaver v. Henderson, 984 F.2d 11, 12 & n.3 (1st Cir. 1993). ______ _________ Three of the four Clean Air Act issues presented to the district court were later addressed by the Second Circuit in a case concerning a challenge to New York's adoption of the LEV standards. See MVMA, 17 F.3d at 521, aff'g in part ___ ____ _____ __ ____ and rev'g in part Motor Vehicle Mfrs. Ass'n v. New York Dep't ___ _____ __ ____ _________________________ ______________ of Envtl. Conservation, 831 F. Supp. 57 (N.D.N.Y. 1993) ________________________ (hereinafter New York DEC). The Second Circuit held in favor ____________ of the state on the identicality and waiver claims, but held in favor of the automakers on the leadtime claim. Id. at ___ 532-35. The court did not consider the merits of the "third vehicle" claim because the district court found material facts at issue and set the claim down for trial. Id. at 530. ___ II. II. PARTIAL DISMISSAL PARTIAL DISMISSAL _________________ Prior to oral argument, plaintiffs moved under Fed. R. App. P. 42(b) to dismiss their appeal as to the -9- 9 identicality, waiver, and third vehicle claims, thereby leaving the leadtime issue as the sole basis for interim relief. Plaintiffs' action was prompted by the Second Circuit's adverse ruling on the identicality and waiver claims, which came after plaintiffs' opening brief was filed in this case. In addition, plaintiffs maintain that the third vehicle claim requires testimony on the effects of sulfur on emissions systems, and that the evidence in the record is outdated and incomplete. We have broad discretion to grant voluntary motions to dismiss. "An appeal may be dismissed on motion of the appellant upon such terms as may be . . . fixed by the court." Fed. R. App. P. 42(b); see also 16 Charles A. Wright ___ ____ & Arthur R. Miller, Federal Practice and Procedure 3988, at ______________________________ 480 (1977). Such motions are generally granted, but may be denied in the interest of justice or fairness. See HCA ___ ___ Health Servs. of Virginia v. Metropolitan Life Ins. Co., 957 _________________________ ___________________________ F.2d 120, 123 (4th Cir. 1992); United States v. Washington _____________ __________ Dep't of Fisheries, 573 F.2d 1117, 1118 (9th Cir. 1978). __________________ DEP contends that this case "presents one of the rare occasions where justice requires that a voluntary motion to dismiss be . . . denied," so that we might rule that the third vehicle claim fails as a matter of law. We are unpersuaded. None of the grounds that have compelled courts -10- 10 to deny voluntary motions to dismiss are present here. See, ___ e.g., Township of Benton v. County of Berrien, 570 F.2d 114, ____ __________________ _________________ 118-19 (6th Cir. 1978) (denying motion to dismiss filed by one of two appellants because dismissal "would be a meaningless gesture," where both appellants pressed same arguments, and both would be affected by decision); Blount v. ______ State Bank & Trust Co., 425 F.2d 266, 266 (4th Cir. 1970) ________________________ (denying appellant's motion to dismiss, but granting appellee's because appellant violated briefing schedule and caused appellee to file motion to dismiss); Local 53, Int'l ________________ Ass'n of Heat and Frost Insulators v. Vogler, 407 F.2d 1047, ___________________________________ ______ 1055 (5th Cir. 1969) (denying motion and affirming on the merits because motion to dismiss was based on unsound argument that appeal from injunction was moot since appellant was voluntarily refraining from enjoined conduct); see also ___ ____ Washington Dep't of Fisheries, 573 F.2d at 1118 (courts _______________________________ "might have grounds" for denying motion to dismiss if sought to evade appellate review and to frustrate court orders). Furthermore, we note that granting the Rule 42(b) motion will not shelter the remaining claims from scrutiny. We will simply be accepting plaintiffs' decision to let those claims be finally adjudicated before bringing them to this court. Creaton v. Heckler, 781 F.2d 1430, 1431 (9th Cir. _______ _______ 1986). The interests of fairness and judicial economy are well served by restricting our review to the leadtime issue, -11- 11 the sole claim both parties concede we must decide. Consequently, we grant the motion for partial dismissal and decline to reach the merits of the third vehicle claim. -12- 12 III. III. LEADTIME LEADTIME ________ We turn to whether the district court was correct in denying a preliminary injunction based on the leadtime claim. We will reverse only if the district court abused its discretion or made a manifest error of law. Narragansett ____________ Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir. 1991). ____________ ________ At issue is the proper construction of the leadtime requirement. The statute at issue, 177 of the Clean Air Act, 42 U.S.C. 7507, empowers states to adopt and enforce California emissions standards for vehicles and motor vehicle engines "for any model year," if the state adopts such standards "at least two years before commencement of such model year (as determined by regulations of the [EPA] Administrator)."2 The parties agree that the model year ____________________ 2. Section 177 states, in pertinent part: Notwithstanding [the statute preempting state emissions regulations], any State which has plan provisions [for the attainment and maintenance of the NAAQS] may adopt and enforce for any model year standards relating to control of emissions from new motor vehicles or new motor vehicle engines . . . if -- (1) such standards are identical to the California standards for which a waiver has been granted for such model year, and (2) California and such State adopt such standards at least two years before commencement of such model year (as determined by regulations of the Administrator). 42 U.S.C. 7507. -13- 13 designation of any particular vehicle depends on when that model or engine was produced. According to EPA, a model year is either the calendar year, or the manufacturer's production period, lasting no longer than a day less than two years, i.e., from January 2 of the preceding year through December ____ 31 of the calendar year for which the model year is named. 40 C.F.R. 86.082-2 ("model year" means calendar year or "the manufacturer's annual production period (as determined by the [EPA] Administrator)"); EPA, Office of Mobile Sources, Advisory Circular 6B (1987) (hereinafter Advisory Circular 6B) (defining annual production period).3 The parties dispute whether or not the leadtime requirement applies on an industry-wide basis. According to plaintiffs, all 1995 models sold in Massachusetts must be federal cars because GM and Chrysler began producing 1995 models prior to January 31, 1994. In other words, the model ____________________ 3. Advisory Circular 6B states, in pertinent part: The "annual production period" for any specific model within an engine family of light-duty vehicles or heavy-duty engines begins either: (1) when such vehicle or engine is first produced, or (2) on January 2 of the calendar year preceding the year for which the model year is designated, whichever date is later. The annual production period ends either: (1) when the last such vehicle or engine is produced, or (2) on December 31 of the calendar year for which the model year is named, whichever date is sooner. -14- 14 year began less than two years after the LEV standards were adopted. Basing its interpretation on Advisory Circular 6B, with support from EPA's amicus brief, DEP demurs, maintaining that the leadtime requirement is satisfied as to any model in an "engine family" first produced after January 31, 1994. The record indicates that an "engine family" is a classification used to group together vehicles that have the same emissions control design. DEP's standards would apply only to models or engine families first produced after January 31, 1994. Plaintiffs characterize DEP's interpretation as "splitting" the model year because the 1995 standards would apply to some, but not all 1995 cars. The district court's position approximated DEP's (and EPA's): "`The failure to provide the statutory leadtime to a particular manufacturer for a particular model year does not invalidate the standards themselves. Instead, it merely __________ renders them unenforceable as against those manufacturers which were not given the requisite two-years notice.'" American Automobile Mfrs. Ass'n v. Greenbaum, No. 93-10799- ________________________________ _________ MA, slip op. at 23 (D. Mass. Oct. 27, 1993) (quoting New York ________ DEC, 831 F. Supp. at 64 (emphasis in original)). The court ___ did not rule on whether each engine family has a different model year commencement date, but noted that Advisory -15- 15 Circular 6B "seems to support DEP's understanding." Id. at ___ 23 n.20. Plaintiffs' industry-wide date for the commencement of the model year prevailed in the Second Circuit. That court held that EPA's position was not entitled to deference because it was "newly minted" for litigation and was not embodied in a regulation under 177. MVMA, 17 F.3d at 535. ____ Moreover, the court found an industry-wide date to be consistent with Congressional intent, while EPA's interpretation was unprecedented and "unreasonable" because it would be confusing to the industry and impractical to enforce. Id. at 535-36. Plaintiffs urge us to follow the ___ Second Circuit. We decline to do so. In the first place, we are not confronted with a regulatory program identical to that at issue in the Second Circuit. New York, like California, but unlike Massachusetts, imposed fleet average requirements to determine the mix of vehicles sold in the state each year. The Second Circuit determined that the leadtime provision was "best read" with an industry-wide commencement date because splitting the year would "unduly complicate the fleet averaging plan." MVMA, 17 F.3d at 535. Manufacturers would ____ be unable to buy and sell emissions credits to meet the requirements because some of them would have to comply with 1995 standards, but others would not. Id. We agree with the ___ -16- 16 Second Circuit that fleet averaging might be more complicated in the first year that California-type standards are effective in a 177 state, but we discount the significance of that consideration. Fleet averaging for emissions programs is a concept devised by California, not Congress. Although the Second Circuit found fleet averaging to be the "crux" of the LEV plan, id., neither party in this case has ___ argued that under 177, states must adopt fleet average requirements.4 Accordingly, the extent to which a split model year interpretation unduly complicates the administration of fleet averaging is not a pertinent consideration. Furthermore, we do not agree with the Second Circuit's characterization of EPA's definition as having been "newly minted" for litigation. EPA did not develop its interpretation during litigation. Rather, the agency issued Advisory Circular 6B in 1987, while New York and Massachusetts adopted California's requirements in 1992. And in a letter dated March 8, 1991, to Congressman John Dingell (D. Mich.), the EPA Administrator cited Advisory Circular 6B for the premise that "a state adopting California emissions standards may apply these standards to any engine family ____________________ 4. The automakers' position during DEP's notice and comment period for the LEV program (which originally included a fleet averaging scheme) was that fleet averaging violates the third ________ vehicle provision by restricting a manufacturer's ability to sell California cars in the state. -17- 17 whose production period begins on a date which is beyond two years past the date that the standards were adopted . . . ." It is significant that EPA's interpretation did not spring from a litigator's self-spun argument, but arose prior to litigation, and was expressed by the Administrator in a letter to a member of Congress from Michigan. See Federal ___ _______ Labor Relations Auth. v. United States Dep't of Navy, 941 ______________________ ____________________________ F.2d 49, 59 (1st Cir. 1991) (deferring to agency interpretation first announced in amicus brief and later adopted as "official" agency position by agency director in unpublished letter); cf. Martin v. Occupational Safety and ___ ______ ________________________ Health Review Comm'n, 111 S. Ct. 1171, 1179 (1991) ("Our _____________________ decisions indicate that agency `litigating positions' are not entitled to deference when they are merely appellate counsel's `post hoc rationalizations' for agency action, ____ ___ advanced for the first time in the reviewing court."). Based on the statutory requirement that "model year" be determined by EPA regulations, the Second Circuit held that Congress intended that EPA would promulgate a regulation defining "model year" under 177. MVMA, 17 F.3d ____ at 535. We disagree. We find that a regulatory definition predating 177 satisfies the statute. Congress's use of the passive voice indicates that an existing regulatory definition would suffice. Compare 177, 42 U.S.C. 7507 _______ ("as determined by regulations of the Administrator") with, ____ -18- 18 e.g., id. 7521(a)(1) ("the Administrator shall" by ____ ___ regulation prescribe federal auto emission requirements). In 1970, Congress passed 42 U.S.C. 7521(b)(3)(A), which defines "model year," for the purposes of the federal emissions control program, as the "calendar year," or "the manufacturer's annual production period (as determined by the [EPA] Administrator) which includes January 1 of such calendar year. . . ." The regulatory definition of model year in effect when 177 was enacted tracked that definition: "`Model year' means [the calendar year, or] the manufacturer's annual production period (as determined by the Administrator) which includes January 1 of such calendar year . . . ." 40 C.F.R. 86.082-2. We also reject the Second Circuit's finding that Congress could not have contemplated that the leadtime provision might apply on an engine-family basis. MVMA, 17 ____ F.3d at 535. We note first that what Congress "contemplated" is of limited relevance, given that EPA was expressly authorized to define when the model year commences. Moreover, since 1972, EPA has issued advisory circulars describing how to determine the model year "for any specific model within an engine family." E.g., Advisory Circular 6A, ____ at 2 (Sept. 1, 1972). And while EPA has never implemented a split model year in the federal emissions control program, we do not place great weight on this. There are relatively few -19- 19 leadtime provisions in the Clean Air Act emissions control program. Because states with 177 programs are, by definition, encountering significant air pollution problems, and because Congress expressly delegated to EPA the power to define model year under 177, EPA may identify policy considerations allowing it to construe the leadtime provisions in the federal program differently from 177. See Comite pro Rescate de la Salud v. Puerto Rico Aqueduct ___ _______________________________ ____________________ and Sewer Auth., 888 F.2d 180, 187 (1st Cir. 1989) ("[W]here ________________ the reason for the court's `deference' reflects its belief ______ that Congress, in effect, delegated to the agency a degree of _________ interpretive power, it does not seem odd to find the agency interpreting the same words somewhat differently as they apply to different parts of the statute in order better to permit that statute to fulfill its basic congressionally determined purposes." (emphasis in original)), cert. denied, _____ ______ 494 U.S. 1029 (1990). On the other hand, one might argue that a court owes EPA's interpretation no deference because the statute requires EPA to define "model year" by "regulation," while EPA's definition is found not in a regulation, but in a policy statement (Advisory Circular 6B). See MVMA, 17 F.3d ___ ____ at 535 ("Section 177 charges the EPA with the single, narrow responsibility to issue `regulations' in order to define the commencement of a model year under 177. The EPA Advisory -20- 20 Circular . . . is not a `regulation' for 177 purposes and was not promulgated specifically to implement this provision . . . ."). Plaintiffs failed to make such an argument to the district court and compounded that error by omitting the point from their opening brief.5 See McCoy v. MIT, 950 F.2d ___ _____ ___ 13, 22 (1st Cir. 1991) ("It is hornbook law that theories not raised squarely in the district court cannot be surfaced for the first time on appeal."), cert. denied, 112 S. Ct. 1939 _____ ______ (1992); see also Frazier v. Bailey, 957 F.2d 920, 932 n.14 ___ ____ _______ ______ (1st Cir. 1992) (arguments raised only in reply brief are insufficient to preserve claim on appeal). Until filing their reply brief in this court, plaintiffs failed to assert that no EPA definition of model year existed for the purposes of 177, and in fact cited Advisory Circular 6B and 40 C.F.R. 86.082-2 to the district court for the premise that the model year began on January 2, 1994. See, e.g., ___ ____ Plaintiff's Mem. of Law in Support of Mot. for S.J., at 44; First Amended Complaint 55 ("As defined by EPA's regulations, the 1995 model year commences as early as January 2, 1994. See 40 C.F.R. 86-082-2 (1992); EPA Office ___ of Mobile Sources Circular 6B (1987)."). ____________________ 5. Plaintiffs argued below and in their opening brief that Congress's use of the terms "commencement" and "model year" in the singular foreclosed a "split" model year, that such an interpretation would have adverse effects on the industry, and that EPA had never used a split model year in the federal emissions control program. -21- 21 We have recognized an exception to the raise-or- waive rule where the argument surfacing for the first time on appeal is "`so compelling as virtually to insure appellant's success,'" and a "`gross miscarriage of justice'" would result from our failure to address it. Johnston v. Holiday ________ _______ Inns, Inc., 595 F.2d 890, 894 (1st Cir. 1979) (citations ___________ omitted); accord United States v. Slade, 980 F.2d 27, 31 (1st ______ _____________ _____ Cir. 1992). The argument here is not so compelling as to assure plaintiffs' success. EPA's interpretation of 177 would be entitled to some weight, where EPA administers the federal emissions program and is charged with evaluating whether state plans for meeting the NAAQS are consistent with the Act. See 42 U.S.C. 7410(k)(3). ___ Furthermore, plaintiffs do not contend that our failure to consider the argument would cause a gross miscarriage of justice. Nor could they so contend. In the first place, this is an interlocutory appeal; plaintiffs may raise the argument in the district court before issues pertaining to the 1995 requirements become moot, because the model year for any vehicle lasts until December 31, 1995. In addition, this is not a case in which an appellant might lose her home, see United States v. One Urban Lot, 885 F.2d 994, ___ _____________ _____________ 1001-02 (1st Cir. 1989), or a prisoner might remain incarcerated, see United States v. La Guardia, 902 F.2d 1010, ___ _____________ __________ 1013 (1st Cir. 1990), if we deem the issue waived. And -22- 22 though the question before us, concerning the earliest date vehicles outside California might be subject to California- type emissions standards, is certainly one of interest to the public, the degree of public interest pales in contrast with that involved when the federal government's right to prosecute suspected criminals is at issue, e.g., United ____ ______ States v. Krynicki, 689 F.2d 289, 292 (1st Cir. 1982). These ______ ________ cases show the gulf that exists between the prospective harm here and the type of harm that permits serious consideration of relaxing the raise-or-waive rule, within the reviewing court's discretion. Accordingly, we find the argument waived for the purposes of this appeal. Assuming, therefore, that the regulatory definition of model year required by 177 is embodied in Advisory Circular 6B, we next inquire whether EPA's interpretation is arbitrary, capricious, or manifestly contrary to the statute. Chevron U.S.A., Inc. v. Natural Resources Defense Council, _____________________ ___________________________________ 467 U.S. 837, 843-44 (1984). Such deference is due because Congress explicitly delegated to EPA, the agency responsible for administering the federal emissions program, the task of defining model year under 177. Plaintiffs argue that applying the leadtime requirement to individual models or engine families contradicts Congress's intent made manifest by the statute's use of the terms "commencement" and "model year" in the -23- 23 singular. We disagree. At best, the statutory language is ambiguous with respect to whether the leadtime requirement might apply on an industry-wide or engine-family-specific basis. See 42 U.S.C. 7507 (State "may adopt and enforce ___ [standards] for any model year . . . if-- . . . California and such State adopt such standards at least two years before commencement of such model year . . . ."). An examination of other leadtime provisions enacted in 1977 for the Act's federal emissions program does not clarify the issue because those provisions generally pertain to heavy duty engines, whose model year commencement date, according to the record, is always January 1 of the calendar year. Moreover, those provisions could be read with either an industry-wide model year commencement date, or separate dates for different engine families. E.g., 42 U.S.C. 7521(a)(3)(E)(ii) (1988) ____ ("No such changed standard shall apply for any model year before the model year four years after the model year during which regulations containing such changed standard are promulgated.") (repealed in 1990). Moreover, the legislative history of 177 is generally unenlightening.6 Congress clearly enacted the ____________________ 6. Plaintiffs, in a footnote, quote a 1990 statement of Senator Nickles: If a State follows the necessary procedures, California standards can take effect in the first model year commencing 2 model years after the State has adopted the California standards. Thus, a State -24- 24 leadtime provision for the manufacturers' benefit. H.R. Rep. No. 294, 95th Cong., 1st Sess. 310 (1977) ("Manufacturers are not only assured of identity of standards and test procedures; they are also assured adequate lead time."); see ___ also MVMA, 17 F.3d at 535. Although plaintiffs would prefer ____ ____ that all 1995 cars be subject to the same regulatory requirements, that is not necessarily the import of that statement of legislative intent. EPA's interpretation grants every manufacturer two years to develop emissions controls and to devise marketing and distribution strategies for any new vehicle or engine family subject to California-type standards. There is no inherent conflict between EPA's interpretation and Congress's intent.7 Plaintiffs maintain that EPA's interpretation does not reflect a reasonable policy determination because it would cause "enormous competitive and practical problems," in that California-type requirements would apply to some 1995 ____________________ that adopted fully waived California standards in November 1992 could, for example, have those standards take effect beginning in model year 1996. 136 Cong. Rec. S18274 (daily ed. Nov. 2, 1990). The leadtime provision was enacted in 1977 and was not amended in 1990. We give little weight to the remarks of a single member of Congress, made thirteen years after a statute is passed, in divining legislative intent. 7. DEP notes that EPA's interpretation has one salutary effect for the industry: each manufacturer could determine, from its own production schedules, not the schedules of others, whether to produce federal or California cars for the first year in which California-type standards are in effect. -25- 25 vehicles, while the remainder would be subject to federal standards. Appellants' Br. at 46. According to plaintiffs, this split would cause dealer and consumer confusion, the disruption of vehicle distribution systems, and competitive disadvantages for some dealers and manufacturers. DEP argues, however, that these concerns are overstated, given the widespread use of computerized inventory controls. Also, on the other side of the balance is the state's interest in applying California requirements to some models as soon as possible. Any vehicle subject to regulatory controls will be subject to those controls for the vehicle's useful life. Conversely, vehicles escaping the controls may travel over Massachusetts highways for years emitting pollutants in excess of California standards. Whether EPA's interpretation imposes greater costs than benefits is a policy determination. "When Congress, through express delegation or the introduction of an interpretive gap in the statutory structure, has delegated policy making authority to an administrative agency, the extent of judicial review of the agency's policy determinations is limited." Pauly v. _____ Bethenergy Mines, Inc., 111 S. Ct. 2524, 2534 (1991). We ______________________ will reject the agency's interpretation only if it is arbitrary or illegal. It is neither. Accordingly, based on the assumption that Advisory Circular 6B provides a -26- 26 regulatory definition of "model year" for the purposes of 177, we conclude that the leadtime requirement was satisfied. The likelihood of success on the merits is a predicate to the issuance of a preliminary injunction. Plaintiffs failed to establish such a likelihood. Moreover, plaintiffs "have not persuaded us that the lower court overlooked pertinent factors, focused on inappropriate factors, or made a serious error in weighing and balancing the relevant concerns." Weaver, 984 F.2d at 14. Therefore, ______ we hold that the district court did not abuse its discretion in refusing to enjoin the 1995 standards. -27- 27 IV. IV. COSTS AND FEES COSTS AND FEES ______________ DEP argues that it is entitled to costs and attorney's fees. Prevailing parties are normally entitled to costs. Fed. R. App. P. 39; 9 James W. Moore et al., Federal _______ Practice 239.02[1], at 39-6 to -7 (2d ed. 1994).8 And ________ costs are routinely available whenever this court dismisses an appeal, even if the appellant moved for dismissal. See ___ Waldrop v. Department of Air Force, 688 F.2d 36, 37 (7th Cir. _______ _______________________ 1982). On the other hand, DEP's argument for attorney's fees must be rejected. DEP seeks reimbursement for legal fees incurred in responding to the appeal on the claims that were dismissed pursuant to Rule 42(b). Neither Rule 42(b) nor Rule 39 provides authority for routine awards of attorney's fees as a condition of voluntary dismissal. Waldrop, 688 F.2d at 37-39. While fees may be awarded if an _______ appellant has filed a frivolous appeal or has acted in bad faith, see Cruz v. Savage, 896 F.2d 626, 631-32, 635 (1st ___ ____ ______ Cir. 1990), we find no evidence of such conduct here. We are ____________________ 8. Rule 39 states: Except as otherwise provided by law, if an appeal is dismissed, costs shall be taxed against the appellant unless otherwise . . . ordered by the court; . . . if a judgment is affirmed or reversed in part, or is vacated, costs shall be allowed only as ordered by the court. -28- 28 unpersuaded by DEP's attempt to characterize the weeks that transpired between the issuance of the Second Circuit opinion and the motion for partial dismissal as evidence of plaintiffs' vexatiousness. It takes time to evaluate a new opinion, and to confer with the client on an appropriate strategy. V. V. CONCLUSION CONCLUSION __________ For the foregoing reasons, we grant the motion for partial dismissal and affirm the district court's decision not to enjoin the 1995 requirements based on plaintiffs' leadtime claim. Costs to DEP. It is so ordered. It is so ordered. _________________ -29- 29