**Slip Op. 06-143**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

|  |  |
|---|---|
| MITTAL CANADA, INC., | |
| Plaintiff, | Before: Richard W. Goldberg, Senior Judge |
| v. | |
| UNITED STATES, | Court No. 05-00689 |
| Defendant, | |
| and | |
| GERDAU AMERISTEEL CORP., and KEYSTONE CONSOLIDATED INDUSTRIES, INC., | |
| Defendant-Intervenors. | |

**OPINION**

[Plaintiff's motion for summary judgment denied.]

Dated: September 22, 2006

Cameron & Hornbostel LLP (Dennis James, Jr. and Alexandra E.A. Minoff) for Plaintiff Mittal Canada, Inc.

Peter D. Keisler, Assistant Attorney General; Marisa Beth Goldstein, U.S. Department of Commerce, Office of Chief Counsel for Import Administration; Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Michael D. Panzera), for Defendant United States.

Kelley Drye Collier Shannon (Mary Tuck Staley, Paul Charles Rosenthal, and Robin H. Gilbert) for Defendant-Intervenors Gerdau Ameristeel Corp. and Keystone Consolidated Industries, Inc.

**GOLDBERG, Senior Judge**: This case presents the Court with plaintiff Mittal Canada, Inc.'s ("**Mittal**") challenge to liquidation instructions that the United States Department of Commerce ("**Commerce**") issued to United States Customs and Border Protection ("**Customs**") on December 15, 2005. The events leading to this dispute are described in the Court's opinion of February 10, 2006 that denied Mittal's request for preliminary injunctive relief enjoining Customs from liquidating the entries at issue. See Mittal Can., Inc. v. United States, 30 CIT ___, ___-__, 414 F. Supp. 2d 1347, 1348-50 (2006) ("**Mittal-PI**").

Since the denial of the preliminary injunction motion, Customs has liquidated the entries at issue consistent with the liquidation instructions that Mittal's case calls into question. Mittal has moved for summary judgment on its underlying claim, requesting that the Court enter judgment in its favor and remand to Commerce with instructions to order Customs to reliquidate the entries at 3.86 percent and refund the difference between that amount and the 8.11 percent at which they were already liquidated. See Pl.'s Br. at 36. For the reasons stated in Mittal-PI, and because in this case liquidation does not operate to divest the United States Court of International Trade ("**CIT**") of jurisdiction, see Shinyei Corp. of Am. v. United States, 355 F.3d 1297, 1312 (Fed. Cir. 2004), the Court has jurisdiction over this case under 28 U.S.C. § 1581(i).

## I.    BACKGROUND

Because the parties are familiar with the background of this case, and because all relevant facts have already been recited at Mittal-PI, 30 CIT at ___, 414 F. Supp. 2d at 1348-50, a lengthy description of the facts is not necessary at this stage.   It suffices for the moment to note that Mittal requested and received a changed circumstances review[1] of Carbon and Certain Alloy Steel Wire Rod from Canada, 67 Fed. Reg. 65944 (Dep't Commerce Oct. 29, 2002) (notice of amended final determination and antidumping duty order).   That antidumping duty order had provided for a weighted average dumping margin of 3.86 percent for Ispat Sidbec Inc. ("**Ispat**").   The "all others" rate was 8.11 percent.   The final results of the changed circumstances review acknowledged that Mittal was the successor-in-interest to Ispat, and directed Customs to require a cash deposit rate of 3.86 percent for Mittal entries occurring in the future.   Commerce then instructed Customs to assess duties at the cash deposit rate in effect at the time of entry for all merchandise that had entered between October 1, 2004 and September 30, 2005 — a period that included the pendency of the changed circumstances review.   Mittal's entries were accordingly

---

[1]    Commerce published the final results of the changed circumstances review in the Federal Register at Carbon and Certain Alloy Steel Wire Rod from Canada, 70 Fed. Reg. 39484 (Dep't Commerce July 8, 2005) (notice of final results of changed circumstances review).

liquidated at the 8.11 percent "all others" rate that was in effect at the time of those entries.

At the preliminary injunction stage in the proceedings, Mittal's argument could be characterized as broadly alleging that Commerce's instructions, by failing to order assessment at the lower rate of 3.86 percent, were contrary to the legal conclusion, articulated in the final results of the changed circumstances review, that Mittal was the successor-in-interest of Ispat.  Since then, Mittal has refined its argument.

On June 19, 2006, Mittal filed a motion for judgment upon the agency record.  In its motion, Mittal made two arguments: (1) that in this case the "automatic liquidation" regulation under which Commerce ordered liquidation, 19 C.F.R. § 351.212, does not require that duties be automatically liquidated at the deposit rate in effect at the time of entry; and (2) that the regulation, if it is construed to contain such a requirement, is itself arbitrary and capricious.

## II.  **STANDARD OF REVIEW**

Mittal has filed a motion for judgment on the agency record under USCIT Rule 56.1.  Rule 56.1 outlines the procedures for adjudicating a motion for judgment on an agency record in "an action other than that described in 28 U.S.C. § 1581(c)."  USCIT R. 56.1.  Since this case invokes the CIT's residual

jurisdiction under 28 U.S.C. § 1581(i), a Rule 56.1 motion is the appropriate vehicle under which to proceed.

Courts review 28 U.S.C. § 1581(i) actions as provided in 5 U.S.C. § 706. See 28 U.S.C. § 2640(e) (2000). Section 706 of Title 5 requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A) (2000). In this case, the administrative action challenged by Mittal is the issuance of liquidation instructions directing Customs to assess antidumping duties at the deposit rate in effect at the time of entry, which was 8.11 percent for the entries at issue.

Normally, "[i]t is emphatically the province and duty of the judicial department to say what the law is," Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803), but when Congress has cloaked an administrative agency with interpretive authority, the federal courts' authority is concomitantly reduced. The threshold question a court must answer is how much, if any, deference Congress has granted to the agency.

This case involves judicial review of two separate types of agency activity. First, Mittal challenges Commerce's promulgation of the automatic liquidation regulation, codified at 19 C.F.R. § 351.212. Second, Mittal challenges Commerce's interpretation of language in the automatic liquidation

regulation.  These questions present different problems, and merit distinct treatment by a reviewing court.

### III. <u>DISCUSSION</u>

**A.   Commerce's Regulation 19 C.F.R. § 351.212 Is in Accordance with Law**

Mittal contends that Commerce's automatic liquidation regulation 19 C.F.R. § 351.212 is not in accordance with law. Specifically, Mittal claims that the regulation is internally inconsistent and that the failure to provide an exemption from automatic liquidation for changed circumstances reviews is arbitrary and capricious.

*1.   Commerce's Promulgation of 19 C.F.R. § 351.212 Is Entitled to <u>Chevron</u> Deference*

As noted above, the Court must determine how much, if any, deference is due to Commerce's automatic liquidation regulation. Congress delegates interpretive authority to agencies both expressly and impliedly.  Where Congress has "explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation."  <u>Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 843-44 (1984).  In other circumstances, Congress may impliedly authorize an agency to pronounce its judgment on an issue with the force of law.  <u>See id.</u> at 844; <u>see also</u> <u>Cathedral Candle Co. v. United States</u>, 400

F.3d 1352, 1361 (Fed. Cir. 2005).  An agency has implicit

authority when it is

> apparent from the agency's generally conferred
> authority and other statutory circumstances that
> Congress would expect the agency to be able to speak
> with the force of law when it addresses ambiguity in
> the statute or fills a space in the enacted law, even
> one about which "Congress did not actually have an
> intent" as to a particular result.

United States v. Mead Corp., 533 U.S. 218, 229 (2001) (quoting

Chevron, 467 U.S. at 845).  Where Chevron deference is

applicable, the court must give effect to the agency's statutory

interpretation provided that the interpretation is reasonable

and not arbitrary.  See Lacavera v. Dudas, 441 F.3d 1380, 1383

(Fed. Cir. 2006).

As a general matter, Commerce is the "master" of

antidumping law, and where its rules and regulations implement a

statutory provision or scheme, it is entitled to considerable

deference.  See Daewoo Elecs. Co. v. Int'l Union of Electronic,

Electrical, Technical, Salaried & Mach. Workers, 6 F.3d 1511,

1516 (Fed. Cir. 1993); Smith-Corona Group v. United States, 713

F.2d 1568, 1571 (Fed. Cir. 1983).  Therefore, the Court's

inquiry must commence by examining the statutory provisions and

scheme that purportedly authorized the regulation.

If an antidumping duty investigation determines that

dumping is occurring, Commerce publishes an antidumping duty

order which directs Customs to assess antidumping duties "equal

to the amount by which the normal value [of the merchandise] exceeds the export price (or the constructed export price) for the merchandise . . . ." 19 U.S.C. § 1673 (2000). The method by which Customs is to assess the duties, however, is not specified in section 1673.

Prior to 1984, Commerce conducted yearly administrative reviews for all antidumping duty orders.[2] See 19 U.S.C. § 1675(a)(1) (1982); 19 C.F.R. § 353.53(a) (1983). Commerce promulgated regulations that governed the assessment of antidumping duties for merchandise subsequent to these administrative reviews. See 19 C.F.R. § 353.53(d) (1983) (requiring the publication of a revised antidumping duty order subsequent to each administrative review); id. § 353.48(a)(1) (requiring Commerce to instruct Customs to assess duties as soon as Commerce "has received satisfactory information upon which such assessment may be based"). In 1984, Congress amended the statute to remove automatic yearly administrative reviews, and instead made administrative reviews available only on request. See Pub. L. No. 98-573, § 611, 98 Stat. 3031 (1984). After the

---

[2] For purposes of this opinion, the term "administrative review" refers to a "periodic review" under 19 U.S.C. § 1675(a), as distinguished from a "changed circumstances review" under 19 U.S.C. § 1675(b). Although it may perhaps be more faithful to the statutory text to refer to "changed circumstances reviews" and "periodic reviews" as subcategories of "administrative reviews," the Court adopts the customary agency vocabulary by equating "administrative reviews" with 19 U.S.C. § 1675(a) "periodic reviews."

amendment, then, there was a gap in the statute whereby entries that were not subject to administrative reviews would not be subject to the assessment regulation 19 C.F.R. § 353.48(a)(1) (1983).  Congress was aware of this gap, and contemplated a regulatory solution: "the administering authority [i.e., Commerce] should provide by regulation for the assessment of antidumping and countervailing duties on entries for which review is not requested . . . ."  H.R. Rep. No. 98-1156, at 181 (1984) (Conf. Rep.), reprinted in 1984 U.S.C.C.A.N. 5220, 5298.[3]

In 1985, Commerce filled this lacuna by promulgating 19 C.F.R. § 353.53a(d), which was the precursor to the current automatic liquidation regulation 19 C.F.R. § 351.212(c).  See Antidumping and Countervailing Duties; Administrative Reviews on Request; Transition Provisions, 50 Fed. Reg. 32556, 32557-58 (Dep't Commerce Aug. 13, 1985) (notice of rulemaking).  In creating 19 C.F.R. § 351.212, Commerce has put in place procedures designed to effectuate Congress' imprecise command for Commerce to assess duties, see 19 U.S.C. § 1673.  Because the statute leaves a gap for the agency to fill, and because 19 C.F.R. § 351.212 fills that gap, the Court owes Chevron

---

[3]  See also Torrington Co. v. United States, 19 CIT 1189, 1198, 903 F. Supp. 79, 87 (1995) ("The legislative history of this provision, however, clearly required Commerce to promulgate a regulation for the assessment of antidumping duties on entries for which no review is requested.").

deference to the agency, and will overturn its regulation only if it is unreasonable, arbitrary, or capricious.

> **2.    *Commerce's Automatic Liquidation Regulation 19 C.F.R. § 351.212 Is Neither Internally Inconsistent Nor Unreasonable on Account of the Lack of Exception for Changed Circumstances Reviews***

Mittal contends that 19 C.F.R. § 351.212 is arbitrary and therefore void.[4] First, Mittal argues that the regulation is internally inconsistent because subsection (a) conflicts with subsection (c). Second, Mittal claims Commerce's failure to create an exception to automatic liquidation that takes account of findings in changed circumstances reviews is arbitrary and capricious. <u>See</u> Pl.'s Br. at 34-36.

---

[4]  Mittal also makes a broad claim that Commerce's "regulations" are arbitrary because "there is no specific provision in the regulations for changed circumstances reviews that do not involve revocation of an order." Pl.'s Br. at 34. Notably, Mittal has adduced no argument as to why the regulations <u>ought to involve</u> anything more than a revocation of an order, and the Court cannot discern Mittal's argument even in the context of the rest of its brief. As such, the terms of the contention do not lend themselves to judicial examination. <u>Cf.</u> <u>Seay v. TVA</u>, 339 F.3d 454, 478 (6th Cir. 2003) ("Because we cannot discern from the vague reference to 'MSPB standards' what Plaintiff's argument is, we affirm the district court's dismissal of this count."). It is possible that Mittal is claiming that Commerce acted illegally by conducting a changed circumstances review and ordering relief other than revocation. However, this dispute is not the occasion to bring that question before the CIT; after all, in this case, Mittal not only brought the changed circumstances review itself, but it also is insisting that relief other than revocation be imputed to the final changed circumstances determination.

Where an agency's interpretation of a statute is internally inconsistent, its claim to reasonableness is obviously compromised.  Cf. Taylor v. Vt. Dept. of Educ., 313 F.3d 768, 779 (2d Cir. 2002) (refusing to approve interpretation of a regulation that would create internal inconsistencies); but see IAL Aircraft Holding, Inc. v. FAA, 206 F.3d 1042, 1050 (11th Cir. 2000) (Cox, J., dissenting) (noting that internal inconsistency is not problematic unless it renders an agency interpretation unreasonable).  Subsection (a) introduces how Customs is to assess duties on entries:

> Generally, the amount of duties to be assessed is determined in a review of the order covering a discrete period of time.  If a review is not requested, duties are assessed at the rate established in the completed review covering the most recent prior period or, if no [administrative] review has been completed, the cash deposit rate applicable at the time merchandise was entered.

19 C.F.R. § 351.212(a) (2005).  Later, subsection (c) describes the process as follows:

> If the Secretary does not receive a timely request for an administrative review of an order . . . the Secretary, without additional notice, will instruct the Customs Service to . . . [a]ssess antidumping duties or countervailing duties, as the case may be, on the subject merchandise . . . at rates equal to the cash deposit of, or bond for, estimated antidumping duties or countervailing duties required on that merchandise at the time of entry . . . .

Id. § 351.212(c)(1).

Mittal notes that subsection (a) contemplates two possible assessment rates for entries as to which no administrative review is requested: (1) the rate established in the completed review covering the most recent prior period and (2) the cash deposit rate applicable at the time merchandise was entered.  On the other hand, subsection (c) mandates assessment at the "rates equal to the cash deposit of, or bond for, estimated antidumping duties or countervailing duties required on that merchandise at the time of entry . . . ."  Id.  On Mittal's reading, the inclusion of "the rate established in the completed review covering the most recent prior period" in subsection (a) contradicts the plain language of subsection (c), which appears to require assessment at the deposit rates in all cases where a review is not requested for the current period.  See Pl.'s Br. at 34 (citing id. at 26 n.4).  Mittal believes that this alleged inconsistency is "a remnant of a proposed change in section 351.212(c) that should not be in the final version of the regulation."  Id. at 26 n.4; see also Def. Int.'s Br. at 8 n.2 (agreeing with Mittal's assessment of the inconsistency).

Mittal's inconsistency argument is not properly before the Court because Mittal lacks standing.  After all, Mittal did not merely decline to request a review for the current period: it

never requested a review for any prior period either.[5]  If an inconsistency exists, it did not in any way affect the treatment of Mittal in this case.  Both subsections require the same result as to Mittal's entries, and Mittal accordingly stands to gain nothing from a determination that the inclusion of a separate treatment for past administrative reviews in subsection (a) is unreasonable.  There is no line of causation between the agency action and Mittal's injury.  See Warth v. Seldin, 422 U.S. 490, 504 (1975).  Because the U.S. Constitution prevents federal courts from adjudicating hypothetical disputes, see Steel Co. v. Citizens for a Better Envm't, 523 U.S. 83, 101-02 (1998), Mittal's inconsistency argument must be disregarded.

Mittal certainly has standing to pursue its second argument, which merits more attention.  As discussed earlier, automatic liquidation applies only "[i]f [Commerce] does not receive a timely request for an administrative review of an order."  19 C.F.R. § 351.212(c)(1) (2005).  The regulation also exempts entries subject to new shipper reviews and expedited antidumping reviews from automatic liquidation.  See id. 351.212(c)(3).  Mittal questions why Commerce may provide for these exemptions, but not provide an exemption for changed

---

[5]  Of course, the lack of administrative reviews from prior periods is explained by the fact that Mittal was only recently constituted.

circumstances reviews.  Mittal's argument relies on an assumption that a changed circumstances review is identical in all relevant aspects to the new shipper review and the expedited antidumping review.  If the reviews are indeed identical, the distinction is arbitrary and even under Chevron deference the Court must invalidate the regulation.  If, however, Commerce has a reasonable basis for not exempting changed circumstances reviews from automatic liquidation, the distinction is not arbitrary and the Court will defer to the agency's construction of the statutes it is charged with implementing.  See Chevron, 467 U.S. at 844.

Commerce argues that the distinction can be attributed to the different consequences flowing from the two sets of reviews.  It points out, correctly, that when Commerce conducts a new shipper review or an expedited antidumping review, it calculates the normal value and export price of specific entries and determines an actual dumping margin that serves as the basis for assessment of duties.  See 19 U.S.C. § 1673e(c) (2000) (allowing Commerce to permit posting bond or other security in lieu of depositing duties, provided an expedited review of the normal value and export price is possible); id. § 1675(a)(2)(B) (requiring Commerce to "conduct a review . . . to establish an individual weighted average dumping margin" during a new shipper

review).[6]  In this respect, these reviews are identical to the

administrative reviews that are exempted outright from automatic

liquidation.

Changed circumstances reviews, however, do not <u>necessarily</u>

calculate the normal value and export price, and do not

<u>necessarily</u> relate to specific entries.  Commerce emphasizes the

broad range of matters to which changed circumstances reviews

may relate.[7]  Commerce contends that 19 C.F.R. § 351.212 seeks to

---

[6]  The "weighted average dumping margin" mentioned in 19 U.S.C. §
1675(a)(2)(B) signifies "the percentage determined by dividing
the aggregate dumping margins determined for a specific exporter
or producer by the aggregate export prices and constructed
export prices of such exporter of producer."  19 U.S.C. §
1677(35)(B) (2000).  The term "dumping margin" means "the amount
by which the normal value exceeds the export price or
constructed export price of the subject merchandise."  <u>Id.</u> §
1677(35)(A).

[7]  Commerce may initiate a changed circumstances review to
examine several factors wholly unrelated to assessment rates.
The scope of Commerce's authority to initiate changed
circumstances reviews under 19 U.S.C. § 1675(b) is delimited
only by the general requirement that there be "changed
circumstances sufficient to warrant a review" of the antidumping
order.  <u>See</u> 19 U.S.C. § 1675(b)(1) (2000).  Commerce's
discretion is broad, and the range of matters subject to changed
circumstances reviews is wide.  <u>See, e.g.</u>, <u>Or. Steel Mills, Inc.
v. United States</u>, 862 F.2d 1541, 1545 (Fed. Cir. 1988) (review
of amount of domestic industry support of antidumping duty
order); <u>Jia Farn Mfg Co., Ltd. v. United States</u>, 17 CIT 187,
193, 817 F. Supp. 969, 974 (1993) (review of importer's resales
of other producer's merchandise); <u>Stainless Steel Sheet and
Strip in Coils from the Republic of Korea</u>, 71 Fed. Reg. 37906
(Dep't Commerce July 3, 2006) (final results of changed
circumstances review) (successor-in-interest review); <u>Carbon and
Certain Alloy Steel Wire Rod from Ukraine</u>, 70 Fed. Reg. 21396
(Dep't Commerce Apr. 26, 2005) (notice of initiation of changed
circumstances review) (reviewing non-market economy status).

halt automatic liquidation at the deposit rates when there is an ongoing review of the assessment rate. On this view, the agency declined to similarly exempt changed circumstances reviews because many, if not most, of those reviews do not result in modified assessment rates. The Court finds that Commerce's distinction, implicit in 19 C.F.R. § 351.212, between changed circumstances reviews and reviews which necessarily determine assessment rates, is reasonable and the regulation is therefore in accordance with law.

**B.   Commerce's Interpretation of 19 C.F.R. § 351.212 Is in Accordance with Law**

**1.   *Commerce's Interpretation of 19 C.F.R. § 351.212 Is Entitled to <u>Seminole Rock</u>/<u>Auer</u> Deference***

Here, Commerce interprets 19 C.F.R. § 351.212 as requiring automatic liquidation at the cash deposit rate in effect at the time of entry. Courts will defer to an agency's fair and considered interpretation of its own ambiguous regulation, unless it is "plainly erroneous or inconsistent with the regulation." <u>Bowles v. Seminole Rock & Sand Co.</u>, 325 U.S. 410, 413-14 (1945); <u>see also</u> <u>Auer v. Robbins</u>, 519 U.S. 452, 461 (1997); <u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504, 515 (1994). The United States Court of Appeals for the Federal Circuit ("**Federal Circuit**") has recently distilled the various factors affecting deference to agencies' regulatory interpretations into a tripartite test. In <u>Gose v. United</u>

States Postal Service, the Federal Circuit observed that "in order to merit Seminole Rock deference, the agency's interpretation (1) must have been directed to regulatory language that is unclear; (2) must have been actually applied in the present agency action; and (3) must not be plainly erroneous or inconsistent with the regulation." Gose v. U.S. Postal Svc., 451 F.3d 831, 839 (Fed. Cir. 2006). "In addition," that court added, "we consider the consistency vel non with which the agency has applied that interpretation." Id.; see also INS v. Cardoza-Fonseca, 480 U.S. 421, 446 n.30 (1987) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view.") (quotation marks omitted).[8]

Turning to the first of the Gose test factors, the regulation is ambiguous in that the interpretation urged by Mittal is not compelled by the plain language of the text of the

---

[8]  An agency's consistency over time in interpreting its regulations eliminates the danger that the agency is attempting a post hoc rationalization of its actions.  Where an agency has maintained a steady interpretive position over time, it is obvious that that position has not been adopted as a litigation tool to defend its past conduct.  Cf. Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.").

regulation.[9]  Second, Mittal does not dispute that Commerce

applied its interpretation to the liquidation instructions at

issue.

Moreover, this case does not present an interpretation of

an agency regulation conflicting with a prior interpretation.

As will be discussed below, the interpretive stance taken by

Commerce in Antidumping and Countervailing Duty Proceedings:

Assessment of Antidumping Duties, 68 Fed. Reg. 23954 (Dept'

Commerce May 6, 2003) (notice of policy) ("**Reseller Policy**")

applies to a different set of circumstances, and is in no way

inconsistent with Commerce's interpretation of the issue

presented in this case.  It is true, as Mittal points out, that

Commerce argued before the CIT in 1993 that automatic

liquidation applied only to entries of companies that were

subject to a specific cash deposit rate and not to those entries

subject to the "all others" rate.  See Federal-Mogul Corp. v.

United States, 17 CIT 442, 447, 822 F. Supp. 782, 787 (1993).

In that case, however, the CIT refused Commerce's

interpretation, holding that

> the statutory framework for administrative reviews
> clearly anticipates that in cases where a company

---

[9]  In this case, it is more likely that Commerce's
interpretation, and not Mittal's, represents the unambiguous
import of the regulation at issue.  However, the Court will
assume that there is some substantial interpretive question to
resolve in light of the Reseller Policy, discussed below.

> makes cash deposits on entries of merchandise subject to antidumping duties, and no administrative review of these entries is requested, the cash deposit rate automatically becomes that company's assessment rate for those entries. . . . In a situation where a company's entries are unreviewed, the prior cash deposit rate from the [less than fair value] investigation becomes the assessment rate . . . .

Federal-Mogul, 17 CIT at 448, 822 F. Supp. at 787-88. Since then, Mittal has provided no example of Commerce interpreting the automatic liquidation instruction in a way that contravenes the Federal-Mogul holding. On the other hand, Commerce has reiterated its commitment to liquidate at the cash deposit rate in effect at the time of entry where automatic liquidation applies. See, e.g., Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27296, 27313 (Dep't Commerce May 19, 1997) (notice of rulemaking) (Commerce declaring its intention "instruct the Customs Service to liquidate that entry and assess duties at the rate in effect at the time of entry") (emphasis added).

Therefore, Commerce's reading of the regulation constitutes a consistent interpretation of an ambiguous regulation that was actually applied in the issuance of the liquidation instructions. As such, the Court will apply a highly deferential review to Commerce's interpretation of 19 C.F.R. § 351.212, and will set aside the agency action only if Commerce's action was "plainly erroneous or inconsistent with the regulation." Gose, 451 F.3d at 839.

    *2.    Commerce's Interpretation that the "Rate Applicable"*
          *Mentioned in 19 C.F.R. § 351.212(a) and the "Required*
          *Rate" in 19 C.F.R. § 351.212(c)(1) Refer to the*
          *Deposit Rate in Effect at the Time of Entry Is Neither*
          *"Plainly Erroneous" Nor "Inconsistent with the*
          *Regulation" and Therefore Is in Accordance with Law*

As discussed in some detail at Mittal-PI, 30 CIT at ___,
414 F. Supp. 2d at 1355-56, the United States uses a
"retrospective" system for the assessment of antidumping duties
and countervailing duties.  The system is "retrospective"
because importers or their brokers are required to deposit
estimated duties prior to imports entering the stream of
commerce in the United States.  See 19 U.S.C. § 1673e(a)(3)
(2000).  These deposits are merely estimates, however, of a
final amount due at a later date when the entries are liquidated
and the duties are assessed.

19 C.F.R. § 351.212 regulates the assessment of antidumping
and countervailing duties.  The regulation, as noted above,
contains two provisions relating to the automatic liquidation of
merchandise not subject to an administrative review.  Subsection
(a) provides that where no administrative review has been
requested, "duties are assessed at . . . the cash deposit rate
applicable at the time merchandise was entered."  19 C.F.R. §
351.212(a) (2005).  Later, subsection (c) requires that Commerce
instruct Customs to liquidate entries as to which no review has
been requested "at rates equal to the cash deposit of . . .

estimated antidumping duties or countervailing duties required on that merchandise at the time of entry . . . ." Id. § 351.212(c)(1). Commerce interprets both these provisions to constitute a requirement for Commerce to instruct Customs to liquidate the entries and assess duties equal to the deposit rate in effect at the time of entry.

Mittal contends that Commerce's interpretation of subsections (a) and (c)(1) are outside the bounds of reasonableness. Specifically, Mittal maintains that the "cash deposit rate applicable at the time the merchandise was entered" (subsection (a)) and "the rate equal to the cash deposit of estimated antidumping duties required on that merchandise at the time of entry" (subsection (c)(1)) are the cash deposit rate found to be appropriate following a changed circumstances review. See Pl.'s Br. at 27.

> **a.    Subsection (a): "The Cash Deposit Rate Applicable at the Time the Merchandise Was Entered"**

Mittal argues that "applicable," as used in 19 C.F.R. § 351.212(a), means "able of being applied" or "appropriate." See id. at 26. While Mittal admits that the "applied" cash deposit rate was 8.11 percent, it insists that after the publication of the changed circumstances review results, the "applicable" cash deposit rate was 3.86 percent. See id. at 27.

The Court does not dispute Mittal's flexible reading of the word "applicable." The term appears countless times in modern statutory language, and in multifarious contexts. Neither does the Court dispute the numerous court decisions and dictionary definitions of "applicable" that Mittal cites in support of its interpretation. See Pl.'s Br. at 26 (citing two dictionaries, state appellate court cases from Florida, Indiana, and Washington, and two federal district court cases). Mittal's argument nevertheless fails because the rate "applicable at the time merchandise was entered" was, in this case, the rate that was actually "applied." The additional language "at the time merchandise was entered" introduces a backward-looking temporality, elided by Mittal's interpretation, that informs any reasonable interpretation of the term "applicable" as used in subsection (a).

The regulation does not refer simply to the "applicable" rate, but to the rate "applicable at the time merchandise was entered." 19 C.F.R. § 351.212(a) (2005). Had Commerce intended to provide for automatic liquidation to take into account new information communicated to Commerce post-entry, its regulation would have ordered its personnel to instruct Customs to liquidate at the rate "applicable at the time of liquidation" or something to that effect. Even leaving the "applicable" unmodified would have at least created more ambiguity than the

regulation before the Court in this instance.  Instead, the rate applicable at the time of entry is the rate that a correct application of the U.S. antidumping laws and regulations would yield, at that moment.

Mittal's interpretation of "applicable at the time merchandise was entered" would gloss over the regulation's obvious temporality.  In this case, the rate "applicable at the time the merchandise was entered" must be the "all others" cash deposit rate of 8.11 percent for one simple reason: at the time of entry, it was impossible for Commerce to know that the former Ispat was operating as Mittal, and that Mittal entries were potentially entitled to a lower rate.  As discussed in Mittal-PI, 30 CIT at ___, 414 F. Supp. 2d at 1355, the retrospective duty assessment system relies on an efficient transfer of information.  It anticipates and contemplates that at the time of entry, Customs will not possess sufficient information to assess with finality the duty amount owed.  By introducing the backward-looking language, the regulation links the assessment rate to Commerce's "state of mind," or the allocation of information, at the moment of entry.  Mittal's interpretation amounts to reading the regulation as referring to "the rate applicable at the time of entry, as determined by a later review"; such an interpretation is nearly unintelligible, and in no way could such a reading be countenanced as required by the

statute.  Instead, the rate "applicable at the time merchandise was entered" is the rate that a correct application of the U.S. antidumping laws and regulations would yield at the moment of entry.  It would be absurd to hold Commerce to a standard of omniscience such that the rate "applicable at the time merchandise was entered" refers to the correct rate in light of information that was not in Commerce's possession.

Of course, it is entirely possible that Commerce's regulation does not achieve Congress' purposes in the most efficient manner, but that is a question for the political branches to discuss.  More importantly, it is Commerce's interpretation of the phrase "applicable at the time merchandise was entered" that is here at issue.  For a federal court reviewing that interpretation, it suffices to point out its obvious reasonableness, and move on.  Commerce acted in accordance with law by holding the 8.11 percent rate to be the applicable rate at the time of entry under 19 C.F.R. § 351.212(a).

> **b.    Subsection (c)(1): "Rates Equal to the Cash Deposit of, or Bond for, Estimated Antidumping Duties or Countervailing Duties Required on That Merchandise at the Time of Entry"**

Regarding subsection (c)(1), Mittal similarly argues that "required" means "to call for as obligatory or appropriate." See Pl.'s Br. at 28.  Mittal cites numerous cases that have

associated "required" with "need" or "necessity."  See id.
Thus, according to Mittal, the "required" rate referred to in
subsection (c)(1) is the "appropriate rate" and not the rate "in
effect" at the time of entry.  See id.  Mittal points out that
the words "in effect" appear nowhere in the relevant
regulations.  Id. at 31.  Thus, Mittal argues the "rate required
at the time of entry" should be the "appropriate" rate, even in
cases where the "appropriate" rate is determined well after "the
time of entry."  See id. at 28.  Commerce interprets subsection
(c)(1) in the same manner as it interprets subsection (a): as a
requirement that duties be assessed at the cash deposit rate in
effect at the time of entry.

This argument is indistinguishable in all relevant aspects
from Mittal's erroneous interpretation of subsection (a).  For
the reasons articulated above, Commerce's alternative reading is
sustained as reasonable.

Before moving on, the Court addresses Commerce's Reseller
Policy, in which Mittal contends Commerce has articulated a
contrary interpretation of subsection (c)(1).  See id. at 28-31.
The relevance of the putatively divergent interpretation is
twofold: first, a novel interpretation breaking with past
practice may strip Commerce's actions of Seminole Rock
deference, see Cardoza-Fonseca, 480 U.S. at 446 n.30; and
second, a prior and well-reasoned inconsistent interpretation

may undercut the interpretation that Commerce advocates in this case.

It was and is uncontroversial that, when a dumping producer has knowledge that goods it sells are destined for the U.S. market, imported purchases of dumped goods are dutiable as if the entries were made by the producer itself.  See Tung Mung Dev. Co. v. United States, 354 F.3d 1371, 1374 (Fed. Cir. 2004). Commerce, in the Reseller Policy, clarified that automatic liquidation would not apply to entries of merchandise sold by resellers that entered the merchandise at the deposit rate of a producer currently the subject of an administrative review: "If [Commerce] conducts a review of a producer of the reseller's merchandise where entries of the merchandise were suspended at the producer's rate, automatic liquidation will not apply to the reseller's sales."  68 Fed. Reg. at 23954.  Commerce insisted the clarification was necessary to address an ambiguity in the earlier system that allowed resellers to benefit from automatic liquidation by depositing duties at the lower of the producer's rate or the "all others" rate.  Id. at 23960.  If a reseller entered the goods at the deposit rate applicable for the dumping producer's domestic sales, the automatic liquidation process would assess those duties.  However, only certain resellers were entitled to the producer's rate: those to whom the producer sold for resale in the U.S. market.

During the notice-and-comment period, the Canadian government objected to the proposed clarification on the grounds that it would violate 19 C.F.R. § 351.212(c)'s provision of automatic liquidation for all entries as to which an administrative review was not requested. See id. Commerce explained that the clarification did not conflict with 19 C.F.R. § 351.212(c) because that regulation required automatic liquidation at the rate "required on that merchandise at the time of entry," not the rate actually deposited:

> This [declared cash deposit] rate may or may not be the proper cash-deposit rate required for those imports because the proper rate depends on the identity of the seller. Where the cash deposit is not the cash-deposit rate of the seller (the price discriminator), it is not the proper cash deposit "required at the time of entry" under U.S. law or [Commerce's] regulations.

Id.

Mittal claims this language suggests that in the Reseller Policy, Commerce articulated the position that the rate "'required at the time of entry' means not what was actually deposited, but, rather, what should have been deposited." Pl.'s Br. at 29. On Mittal's reading, the Reseller Policy proves that "Commerce itself has recognized that the term 'required' in the 'automatic assessment' provision language does not, in fact, mean that only the duty 'in effect at the time of entry' will be assessed." Id.

Mittal's argument conflates the "rate that was in effect" with the "rate that was applied."  However, those two rates are different in crucial respects; Commerce has never read 19 C.F.R. § 351.212(c)'s mention of the rates "required at the time of entry" as referring to the amounts that the importer actually deposited (i.e., the rates "applied").[10]  For instance, an importer may enter merchandise at a rate inferior to the rate that corresponds to its entries.  In fact, the clarification in

---

[10]  In an attempt to justify a proposed (though ultimately rejected) rule change in 1997, Commerce observed that when it "did not receive a request for the review of particular entries of subject merchandise, [Commerce] would instruct [Customs] to liquidate those entries and assess duties at the cash deposit rate applied to those entries at the time of entry." Antidumping Duties, Countervailing Duties, 62 Fed. Reg. 27296, 27313 (Dep't Commerce May 19, 1997) (final rule) (emphasis added).  However, later in the notice Commerce articulated its definitive ruling, which indicated that its practice was to liquidate automatically at the rate in effect:

> In light of the comments received, [Commerce] has decided to continue its current practice with respect to automatic assessment; i.e., if an entry is not subject to a request for a review, [Commerce] will instruct [Customs] to liquidate that entry and assess duties at the rate in effect at the time of entry.

Id. at 27314 (emphasis added).  The distinction between the rate in effect and the rate applied was not relevant to the proposed rule change.  It is more reasonable to read the reference to the "rate applied" as a description of Commerce's general practice. That is to say, Commerce was merely observing that in nearly all cases, 19 C.F.R. § 351.212(c) operates to require liquidation at the rate applied.  This is because in nearly all cases, the rate applied is the rate in effect at the time of entry.  Indeed, the Reseller Policy example presents an exceedingly rare, perhaps anomalous, case where the importer does not request a review but Commerce learns of information prior to liquidation that sheds light on the rate that was in effect at the time of the reseller's entries.

the Reseller Policy was aimed at curtailing precisely this abuse.  In such a case, the amount and rate of duties deposited is lower than the amount and rate of duties that a proper application of U.S. antidumping duty law would have yielded for those entries.  The Reseller Policy interprets 19 C.F.R. § 351.212(c) to mandate automatic liquidation at the proper antidumping duty rates as determined by Commerce in an administrative review of the producer.  These rates, then, are the rates "required on . . . merchandise at the time of entry," 19 C.F.R. § 351.212(c).

At the time of entry, there is a determinable and quantifiable amount of duty that must be deposited for each entry of merchandise into the United States that is subject to an antidumping or countervailing duty order.  Most of the time, upon entry importers will deposit estimated duties as required by the duty law.  In the case of resellers, this means that most resellers will accurately report which of their entries are dutiable at the rate of the producer based on the producer's knowledge of the merchandise's eventual sale in the United States.  However, it no doubt transpires that on occasion resellers deposit a lower rate than the required rate.  In many such cases, the misreporting importer will go undetected and Commerce will instruct Customs to liquidate automatically at the underreported deposit rate.  Other times, Customs will detect

the error, and order the collection of any deficiency under 19

U.S.C. §§ 1484-85.  And yet there is still a peculiar subset of

entries, as described by the Reseller Policy, where a collateral

administrative review of a producer will shed light on the

accuracy of the rates deposited by the reseller.

During the producer's review, Commerce is able to inquire

into the proper deposit rates for the reseller's entries as

well.  Recalling that deposit rates are merely estimated duties,

it would be strange indeed to prefer assessment at the deposit

rate when the producer's administrative review will determine

what the appropriate assessment rate is based on the producer's

testimony relating to the dispositive factor: i.e., whether the

producer knew that the merchandise sold to the reseller was

destined for the U.S. market.  The Reseller Policy points out

that since the producer's administrative review will elucidate

the actual deposit rates in effect at the time of entry, it

would be premature to proceed with automatic liquidation.  In

essence, the Reseller Policy imposed a stay on Commerce's

automatic liquidation process, which aims at a rough

approximation of duties owed, when an ongoing administrative

review offered the possibility of a more precise approximation

of duties owed.

Most importantly, the new information regarding the

producer's knowledge of the merchandise's destination did not

purport to change the "applicable" rate; instead, it simply shed light on what that rate was.  By investigating the producers' intentions at the time of the original sale, Commerce determines the resellers' applicable rates at the time on entry.  This backward-looking evidentiary investigation is fundamentally different than the changed circumstances review at issue in this case.  Since in the case of a reseller the rate in effect at the time of entry depends entirely on the producer's knowledge, testimony relating to that dispositive factor impacts significantly on the question of which rate was applicable at the time of entry.  Conversely, a changed circumstances review examining a successor-in-interest determination in no way impacts the cash deposit rate in effect at the time of entry.

Until the name change is formally recognized (usually in a changed circumstances review) and Commerce establishes a new cash deposit rate, the deposit rate in effect at the time of entry is the rate that appeared in the <u>Federal Register</u> on the date of entry.  In the case of Mittal (at the time, still not the successor-in-interest to Ispat as far as Commerce was aware), that rate was the "all others" rate of 8.11 percent.

Commerce's actions in the events leading to this case do not contradict any agency interpretations in the <u>Reseller Policy</u>, and its interpretation of both subsections (a) and (c)(1) are entitled to full <u>Seminole Rock</u> deference.  Because

both interpretations are reasonable, Commerce's actions were in accordance with law.

## IV. <u>CONCLUSIONS</u>

Commerce's regulation 19 C.F.R. § 351.212 is a reasonable accommodation of Congress' delegated authority for Commerce to instruct Customs to assess antidumping duties. Commerce's interpretation of subsections (a) and (c)(1) of that regulation are similarly reasonable, and well within the bounds of its discretion. Accordingly, Plaintiff's motion for judgment on the agency record is denied. An order will be issued dismissing the case, <u>see</u> USCIT R. 56.1(f).


/s/ Richard W. Goldberg_____
**Richard W. Goldberg**
**Senior Judge**

**Dated:      September 22, 2006**
**            New York, New York**